## VALIDITY OF NON-COMPETITIVE EXAMINATION PARAGRAPHS OF THE CIVIL SERVICE LAW.

Superior Court of Cincinnati.

THE STATE OF OHIO, EX REL THOMAS C. CARNES, v. PHILIP C. FOSDICK, DIRECTOR OF PUBLIC SERVICE OF THE CITY OF CINCINNATI.

Decided, March 2, 1914.

*Constitutional Law—Non-competitive Examinations Under the Civil Service Law—Not a Provision for Exercise of the Appointing Power —Nor is there a Privileged Class Created—Equal Protection and Uniform Operation of Laws—Section 486-10, General Code.*

1. The last paragraph of Section 10 of the civil service act of May 10th, 1913 (103 Ohio Laws, 698, 703) is not repugnant to the Constitution of the state as an exercise of the appointing power (Article II, Section 27); nor does it violate the constitutional requirement that all laws of a general nature shall have a uniform operation throughout the state. (Article II, Section 26.)

2. The last paragraph of Section 10 of the civil service act of May 10th, 1913 (103 Ohio Laws, 698, 703), which continues in service incumbents who have not been appointed under previous civil service laws, conditioned upon their passing non-competitive examinations, is not in violation of Section 10, Article XV of the Constitution of Ohio, which provides for the establishment of civil service in this state, nor is it obnoxious to the constitutional principle which forbids the creation of a privileged class and the denial of the equal protection of the law.

*Moulinier, Bettman & Hunt*, for relator.

*Walter M. Schoenle*, City Solicitor, and *Charles A. Groom*, Assistant City Solicitor, contra.

PUGH, J.

On January 25th, 1912, the relator, Thomas C. Carnes, was appointed assistant foreman in the filtration department of the water works of the city of Cincinnati. On April 28th, 1913, the General Assembly enacted the civil service act which went into effect January 1st, 1914. On January 10th, 1914, the relator was removed from the position to which he had been appointed almost two years before, and shortly thereafter brought this action wherein he prays that a writ of mandamus may be issued

ordering the defendant, the director of public service, to reinstate him in the position from which he was so discharged.

The relator was appointed by the then director of public service at a time when the position of assistant foreman was included in the unclassified civil service, but in March, 1912, the existing civil service commission adopted a rule by which the position, together with some others, was included in the classified service, where it has remained ever since. The relator when appointed did not take any examination of any kind as to merit and fitness nor was any required of him when the position was transferred to the classified service.

It is claimed by counsel for defendant, as preliminary to their main contention, that the relator was not legally appointed to the position he held and was therefore subject to removal at any time, and the case of *State, ex rel,* v. *Lea, Director,* 10 Ohio N.P.(N.S.), 364 (affirmed without report), is cited to sustain this claim. This case decides that, when a civil service statute is in effect, appointments to public employment in the classified service must be made in accordance with such statute and that, when an appointment has been made without the requirements of the statute having been complied with, such appointee is not protected by the provisions of the civil service law and may be discharged without any formality whatever.

The law that governed matters of this kind in January, 1912, when the relator was appointed assistant foreman of the filtration plant, is contained in General Code, Section 4479—now superseded by the existing civil service act. This section divided the civil service into the unclassified and the classified service, and proceeded to enumerate those positions which constituted the unclassified service, and this was followed by this sentence:

"The classified service shall comprise offices and places not included in the unclassified service."

Among the positions of the unclassified service, the statute included "persons who are appointed to positions requiring professional or technical skill *as may be determined by the civil service commission,*" and, toward the end of the section, "unskilled laborers."

"Unskilled laborers" were therefore placed in the unclassified service by the statute itself, but persons occupying positions requiring "professional or technical skill" might be in either class according as the civil service commission deemed best for the public interest. In March, 1913, the existing civil service commission adopted a new code of rules whereby, among other things, all "unskilled laborers receiving not more than $2 per day" were placed in the unclassified service, but those receiving more than that sum were included in the classified service. The position of assistant foreman held by the relator was thereby transferred to the classified service. It is not entirely clear why the division of unskilled laborers into two classes was made in this way, but, apparently, the commission regarded all those laborers who received more than $2 per diem as possessing such degree of "professional or technical" skill or knowledge as warranted their inclusion in the classified service.

Be that as it may, it is not material in this case to inquire whether the civil service commission exceeded its powers in March, 1912, in transferring the position held by the relator from the unclassified to the classified service. If the rule by which this was done was void, as claimed by counsel for the defense, the appointment of the relator on January 25th, 1912, still held good and he remained assistant foreman of the filtration plant in the unclassified service just as he was before. A rule that was void could in nowise affect him. But it is material to notice that, on January 1st, 1914, when the new civil service act took effect, he was an incumbent of a position which, under that law, was "in the competitive classified service" and therefore as will presently appear, under the last paragraph of Section 10 thereof, he could not be discharged or removed from that position except as therein provided.

Coming now to the main contention in the case, it is claimed that, assuming the relator on January 1st, 1914, was a legal appointee of the position of assistant foreman of the filtration department, the civil service act which went into effect on that day, contained nothing which legally prevented his superior officer from discharging him at pleasure since the only provision of the act to the contrary was invalid in that it violated several sections of the Constitution of the state,

The circumstances of the relator's discharge, as shown by the undisputed testimony, were these:

About four o'clock, on the afternoon of Saturday, January 10th, 1914, the relator was shown a typewritten paper which read as follows:

"NOTICE.

"It is the order of the Director of Public Service that the services of the following men be dispensed with. This order takes effect at 4 P. M. January 10th, 1914. F. Yungbluth; Harry Carnes; C. Roush; Thomas Carnes; Grover Green; John Figgins.

"Filtration Plant.      (Signed) J. W. ELLMS,
"January 10th, 1914.      *Superintendent of Filtration.*"

The relator was permitted to read this paper but no copy of it was given him, and he was also told by word of mouth that he was discharged. No other formality of any kind was observed, except that, later on, the director of public service filed with the civil service commission the following document:

"CINCINNATI, JANUARY 27th, 1914.
"CIVIL SERVICE COMMISSION,
      "City Hall.
"*Gentlemen*: This is to advise you that Thomas Carnes, employed as laborer, River Station, W. W., left the service of this department on the 10th day of January, 1914, for the following reasons:

"Services no longer necessary and for further economy.

"PHILIP FOSDICK, Director of Public Service Department.
"Per P. S. JOHNSON, .................Officer.
      "*Secretary.*"

It has already been held by this court, in the case of *State, ex rel,* v. *Schneller,* 15 N.P.(N.S.), —, that, in so far as the removal of incumbents of offices and positions was concerned, the civil service act of May 10th, 1913, took effect January 1st, 1914. The director of public service, therefore, should have followed the provisions of that statute in discharging the relator on January 10th, 1914, but it is apparent, at first glance, that he failed to comply with them in two important respects.

Section 8 of the act, following former enactments, divides the civil service of the state, the counties, cities and city school districts thereof, into the unclassified and the classified services,

and the position of assistant foreman of the filtration plant is plaintly included in the classified service as therein made.

The relator, as stated, was appointed to a position which, at the time, was under the unclassified service and when, several months after, the place was transferred to the classified service, he was not required to undergo any examination as to his merit and fitness. His right, however, whatever· it might be, to continue in the public employment on and after January 1st, 1914, depended upon the construction and validity of the last paragraph of Section 10 of the new law, which is as follows:

"The incumbents of all offices and positions in the competitive classified service, except those holding their positions under existing civil service laws, shall, whenever the commission shall require, and within twelve months after the rules adopted by the commission go into effect, be subject to non-competitive examinations as a condition of continuing in the service. Reasonable notice of all such non-competitive examinations shall be given in such manner as the commission may require and all such non-competitive examinations shall conform in character to those of the competitive service."

On January 10th, 1914, the relator was an incumbent of a position in the competitive classified service and in the opinion of the court he did not hold such position under any civil service law as meant by the above statutory language. The provisions of the civil service act relating to the discharge or removal of incumbents of such positions, are as follows:

"Section 2.  *  *  *  On and after January 1, 1914, no person shall be appointed, removed, transferred, laid off, suspended, reinstated, promoted or reduced as an officer or employee in the civil service under the government of this state, the counties, cities and city school districts thereof, in any manner or by any means other than those prescribed in this act."

The above provision must be read in connection with Section 17 of the same act, which is as follows:

"Section 17.  No person shall be discharged from the classified service, reduced in pay or position, laid off, suspended, or otherwise discriminated against by ·the appointing officer for religious or political reasons. *In all cases of discharge,* lay off, reduction or suspension of a subordinate, whether appointed for a definite term or otherwise, *the appointing officer shall furnish*

*the subordinate discharged,* laid off, reduced or suspended *with a copy of the order of discharge, lay off, reduction or suspension, and his reasons for the same and give such subordinate a reasonable time in which to make and file an explanation. Such order together with the explanation, if any, of the subordinate shall be filed with the commission.*"

Assuming that the above provisions of the new law are valid, it is obvious that, *first,* no "copy of the order of discharge" was ever furnished the relator as required by Section 17 above quoted, and, *second,* no copy of such order of discharge was ever filed by the public service director with the civil service commission as prescribed thereby, and that the discharge was therefore illegal.

It is idle to pretend that the paper shown Thomas Carnes, on January 10th, 1914, is such an "order of discharge" as is contemplated by Section 17 of the civil service act. The most important qualification of "discharge" as prescribed by the statute, is that the "reasons" therefor shall be given and a copy of the "order of discharge" be furnished the person discharged so that he may know why he is removed, and, if there be charges against him, may answer or explain them. The document filed by the director of public service with the commission is equally objectionable; it does not even purport to be a copy of an "order of discharge" but, at best, is a mere notice that the relator "left the service" some seventeen days before for reasons given therein.

For answer to the above the defendant claims that the last paragraph of Section 10, above quoted is invalid in that it violates the Constitution of the state in several important particulars. If this claim is well founded, there is nothing in the civil service act which warrants the continuance of the relator in the public employment and the director of public service was justified in discharging him.

(1). It is contended that the paragraph in question is invalid because it violates Article II, Section 27, of the Constitution of Ohio, which forbids the exercise by the General Assembly of what is known as the "appointing power."

The argument is that, on January 1st, 1914, when the present civil service act took effect, there were many incumbents of offices

and positions throughout the state, holding state, county and municipal positions, who had been elected or appointed without having undergone examinations of any kind as to their merit and fitness and were not incumbents under any previous civil service law, all of whom, but for the last paragraph of Section 10 of the new law, were subject to discharge or removal at the discretion of the appointing officer. The effect of the paragraph in question is to continue them in office indefinitely and this, it is claimed, amounts in effect to the appointment by the General Assembly of these incumbents to these positions and offices.

The court, however, is of the opinion that this provision of the civil service act does not constitute an appointment to office or position. As pointed out in argument, the act was passed April 28th, 1913, was approved May 5th, 1913, and filed in the office of the Secretary of State, May 10th, 1913, while the incumbents of offices and positions who are conditionally continued in office or position are not those who were incumbents when the statute was enacted, but those who might be incumbents of such offices and positions on January 1st, 1914. A period of eight months intervened between the time when the statute was enacted and when it went into force. There existed no means of ascertaining on May 10th, 1913, when it is claimed this appointing power was exercised, who these so-called appointees would be. While it was possible, and, in some instances probable that those persons who were incumbents of public offices and positions in the spring of 1913, would remain as such until January 1st, 1914, on the other hand, it was equally possible, and in some instances just as probable that many changes would take place in the interval. The effect of the new law, under these circumstances, even though it operated to continue in place those who were in public service at the time the law was enacted, can not be considered as an appointment. Appointment to place or office presupposes a definite, identified appointee or appointees, and a provision that those persons might be in place eight months thereafter is not an exercise of the appointing power. It is quite likely that some of the incumbents affected by this act occupied positions which were created or came into existence for the first time after the passage of the statute. With the exception of those incumbents holding offices and positions under former

civil service laws (to whom no objection is made in this case) most of those in public service in April and May, 1913, were appointees for indefinite periods of time and liable to removal at any time at the discretion of the appointing officers or boards, and doubtless many of them were removed after May 10th, 1913, and before January 1st, 1914.

This view of what is meant by the appointing power is fully borne out by the decisions in analogous cases in this state. See *Gleason* v. *The City of Cleveland*, 49 Ohio St., 431, 437, a case that goes much farther than the one at bar. In the case of *State, ex rel*, v. *Hall et al*, 2 Ohio C.C.(N.S.), 237, exactly the same claim as is made here was urged against a statute which continued indefinitely in service the existing police force under conditions not unlike those provided for in the existing civil service act, and much of what is said by the court in upholding the statute in that case applies here. The statute makes no appointments but operates on appointments already made; it does not provide that incumbents shall remain in service in any event, but only if they pass civil service examinations of the same character as those imposed upon applicants for employment under competitive classified service; it does not continue in service incumbents whose terms had expired, nor does it extend the period of service of those incumbents whose terms of service are definite periods of time fixed by law.

For these reasons the court feels fully warranted in declaring that the paragraph of Section 10 objected to is not an exercise by the Legislature of the appointing power as claimed by the defendant.

(2). It is further objected that the paragraph of the civil service act in question violates the first clause of Article II, Section 26, of the Constitution of the state, which reads as follows:

"All laws of a general nature shall have a uniform operation throughout the state."

The court has been unable to appreciate fully the argument made in support of this objection. The civil service act of May 10th, 1913, and every section of it, including of course the paragraph objected to, is a law of a general nature, but wherein it fails to operate uniformly it is difficult to comprehend. By its

express terms, it applies to all "offices and positions of trust, or employment, including mechanics, artisans, and laborers in the service of the state, and the counties, cities and city school districts thereof." Wherever in the state the conditions described in the last paragraph of Section 10 exist, the provisions of that paragraph operate and in exactly the same manner and upon the same class of persons. It is quite likely, as argued, that in some counties, cities and school districts there were incumbents of positions on January 1st, 1914, who had not been appointed under any civil service law, and that in other counties, cities and districts there were no incumbents at the time of such positions, and, possibly, in some places, no such positions existed. But this is not a legal objection; the law was none the less in force. All that the constitutional provision requires of a statute of a general nature is that, wherever, throughout the state, the same conditions exist, it shall affect and operate upon all concerned in the same way. In the inheritance tax case (*State, ex rel,* v. *Ferris,* 53 Ohio St., 314), it is said in the second proposition of the syllabus:

"A law of a general nature, which is in full force in every part of the state, complies with Section 26 of Article II of the Constitution, requiring laws of a general nature to have a uniform operation throughout the state."

The paragraph of the civil service act objected to answers the above description, it is in full force and effect in every county, city and school district of the state.

(3). The next objection to the clause in question is that it creates a privileged class in that it confers benefits upon those who were incumbents of positions on January 1st, 1914, which it denies to all other persons. This claim, if well founded, would make this provision obnoxious to Amendment XIV, Section 1, of the Constitution of the United States, as well as to the intendment if not the direct expression of the Constitution of the state, as it would be a denial of the equal protection of law to those excluded from the office-holding class. Under this law, incumbents of public positions on January 1st, 1914, who had been appointed to office without examination of any kind, are continued therein, if within say a twelve-month and after notice, they are able to pass civil service examinations, which are *non-competitive,*

while all others are required to undergo the stress of competitive
examination, and this, it is argued, gives the former class an
unfair and undeserved advantage over all others desiring pub-
lic employment, in violation of the constitutional limitation men-
tioned and particularly and additionally in violation of the re-
cent addition to the state Constitution (Article XV, Section 10),
which reads thus:

"Appointments and promotions in the civil service of the
state, the several counties and cities, shall be made according
to merit and fitness, to be ascertained, as far as practicable, by
competitive examinations.. Laws shall be passed providing for
the enforcement of this provision."

As stated by this court in a recent decision (*State, ex rel,* v.
*Schneller,* 15 N.P.(N.S.), —, the civil·service act of May 10th,
1913, creates an entirely new, self-contained and far reaching
system which embraces within its provisions every office and posi-
tion in the civil service of the state and its political subdivisions.
In many respects, it is entirely different from any system ever
before tried in this state.   No matter at what particular time it
was made to take effect, there would necessarily be found thou-
sands, perhaps tens of thousands, of persons serving the state,
the counties, cities and school districts thereof, in various posi-
tions of public employment, some elected, some appointed; some
with terms fixed by law, others serving at the discretion of some
appointing officer or board; some appointed under previous civil
service laws and some under the so-called spoils system; and
some of these offices and positions it was desired to include in the
classified service created by the new law and others to leave to
the discretion of superior appointing officers.

While the provision of the state Constitution under authority
of which this statute was enacted (Article XV, Section 10)
plainly discloses that it was intended that "merit and fitness"
as determined by competitive examinations should be required of
those holding public employment, none the less the parenthetical
qualification, "as far as practicable" shows that the General
Assembly recognized that rule could not be made absolute and
that, in the nature of things, allowance would have to be made
for exceptions.

In some places, on January 1st, 1914, there were civil service commissions already in existence under former laws ready to take up the work of preparing examinations, eligible lists and the like, with such changes as were demanded by the new law, but in other places there were no such commissions in existence. In many places. facilities for doing the work were not at hand and had to be provided. Many additional positions were included by the new law in the classified service and it was essential to notify the public and call for applicants.

Competitive examinations, as anyone who has had experience of them knows, take much time in the preparation of the tests or questions; the examinations themselves, and the determination of the relative standing of the competitors is work that can not be done in a hurry. Tests proper to be imposed upon applicants for one position would not be germane or relevant to applicants for others, and each particular position has to be dealt with separately. In the meanwhile, beginning January. 1st, 1914, public business to a great extent would have come to a standstill or got behind or into confusion all over the state unless some provision was made for continuing in service the present incumbents. In the judgment of the Legislature. it was not "practicable" to put into operation such an extended, radical system as contemplated by the act of May 10th, 1913, without some provision for carrying on public business until the new arrangements could be completed, and the last paragraph of Section 10 was enacted for this purpose.

Whether, in view of the many offices and positions and the thousands of persons concerned, a better arrangement than that prescribed by the last paragraph of Section 10 of this act could have been made, it is not for the court to determine. The constitutional provision vested the General Assembly with the exercise of such discretion as was essential to ascertain in what instances competitive examinations were practicable and in what not, and the legislative action in this regard can not be controlled by the court.

It is true that the last paragraph of Section 10 of the civil service act provides for the retention of office and position by incumbents conditioned upon their undergoing non-competitive examinations, and that, apparently it would have been practicable

to require them to submit to competitive examinations at some time or other. On the other hand, it is true that by keeping in public employment those incumbents, who had already, in many cases at least, acquired experience and skill in their work, the community received a distinct benefit, and it was fully protected against incapable or incompetent servants by the requirement that within a limited time such incumbents should pass an examination as to merit and fitness of the same character as that which applied to the competitive service.

In view of considerations of this kind, courts have frequently held that provisions like those under consideration, whereby, when a new and far reaching system of civil service is inaugurated, incumbents of public positions are continued indefinitely in employment in order to prevent confusion and delay in carrying on public business, are valid although for a time they seem to discriminate in favor of some and against others. Such arrangements are obviously for the public benefit, though they may incidentally operate to the advantage of individuals. See the cases above cited, *State, ex rel,* v. *Hall et al,* 2 Ohio C.C.(N. S.), 237, and *Gleason* v. *The City of Cleveland,* 49 Ohio St., 431.

Laws in relation to the holding of positions of public employment are not enacted for the benefit of those who are to be appointed to such service but are intended in the interest of the public and they should be considered and construed by the courts from this standpoint. There is no property right to be appointed to or hold public office. The public employee is the public's servant and while it would be obviously unjust and impolitic to enact laws for the purpose of favoring one member or class of the community more than another in the matter of being appointed to or continued in public employment, it would be equally unjust and impolitic to deal with and construe laws of great moment and necessity to the public welfare as if the only matter to be considered was how they affected those who might be called upon to hold office under them. The latter would be to return to the point of view of those who advocate the spoils system by which every law is considered, weighed and approved or disapproved according as it affects the office holder or public employee and with little or no regard for the interest of the general public.

The most firmly established and universally recognized rule of constitutional construction is that which, while recognizing the power of courts to declare invalid an act of the General Assembly, declares at the same time that such power must not be exercised if it can in any way within reason be avoided.   Time and again, courts in every state have announced this rule and our own Supreme Court has not been among the least emphatic. All presumptions within reason must be applied to uphold statutes.   Almost seventy years ago it was said by Judge Hitchcock of our Supreme Court, in deciding a case (*Lewis, Trustee, v. McElvain,* 16 Ohio, 347, 354) :

"I am no advocate of legislative supremacy nor do I doubt the power and the duty of this court, in a proper case, to declare a law unconstitutional.   I do not believe, however, that the General Assembly will ever pass a law with the intention of violating the Constitution.   Nor can I ever consent to declare one of their acts void on this account, unless it is palpably against both the letter and spirit of that instrument.   So long as there is *any, the least, doubt* upon the subject, the law must be enforced."

In one of the last cases reported from our own Supreme Court (*State, ex rel,* v. *Miller,* 87 Ohio St., 12), Judge Donahue, in reaffirming the power of the court to set aside an act of the Legislature, cites Chief Justice Marshall (in *Fletcher* v. *Peck,* 6 Cranch, 87), as saying:

"The opposition between the Constitution and the laws should be such, that the judge feels a clear and strong conviction of their incompatibility with each other."

In *Railroad Co.* v. *Commissioners,* 1 Ohio St., 77, 82, Judge Ranney thus states the same rule:

"It is never to be forgotten that the presumption is always in favor of the validity of the law; and it is only when manifest assumption of authority, and clear incompatibility between the Constitution and the law appear, that the judicial power can refuse to execute it.   Such interference can never be permitted in a doubtful case."

Again quoting Judge Donahue, *State, ex rel,* v. *Miller, supra,* p. 28:

"This then is the established doctrine in this state, and the discussion or citation of further authorities would be superfluous."

This doctrine appears to the court singularly applicable to the case at bar. The very thorough argument on both sides has brought out clearly the strength and weakness of the civil service act and especially of the disputed paragraph—the last one of Section 10, and has left upon the mind of the court the impression that the few sentences comprised in this paragraph are to a certain extent inconsistent with the rest of the statute, and that rigid and logical adherence to the rule "of merit and fitness to be ascertained, as far as practicable, by competitive examinations" had, in this single instance, been relaxed in some degree to meet the difficulties which it was foreseen would naturally follow such a radical change in the matter of the appointment to positions of public employment as was contemplated by this law.

If this provision is held invalid, the civil service act itself, it is true, will remain intact in every other particular, but the putting into operation of the comprehensive and effective system of civil service contemplated by the constitutional requirement above quoted and which the General Assembly has endeavored to create, will be postponed almost indefinitely, confusion and delay will ensue in the administration of public business, and the spoils system be given another lease of life. If it were plainly the duty of the court to set aside this enactment of the General Assembly, it would be done regardless of consequences, but no such duty is apparent; on the contrary, while there are difficulties in adjusting some of the provisions of the act to constitutional requirements, on the whole it is in accord therewith and as such should be upheld by the court.

In view of what has here been stated the court is of the opinion that the last paragraph of Section 10 of the civil service act of May 10th, 1913, the only one that has been challenged, does not violate any of the provisions of the Constitution.

The writ of mandamus will be issued as prayed for in the amended petition.